**David E. KELLY, Plaintiff,**

v.

**MUNICIPAL COURT OF MARION COUNTY, et al., Defendants.**

**No. IP 91–1183–C.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

May 10, 1994.

---

John O. Moss, Jack C. Brown, Indianapolis, IN, for plaintiff.

Seth M. Lahn, Deputy Atty. Gen., Indianapolis, IN, for defendants.

BARKER, Chief Judge.

David E. Kelly ("Plaintiff") believes that the Defendants in this cause violated his constitutional rights by discharging him from his employment as a bailiff in the court of Judge Wendell Mayer of the Municipal Court of Marion County and by allegedly maintaining a work environment that was hostile to blacks and Christians. This Court earlier dismissed most of the claims in the Plaintiff's second amended complaint, *see* Entry of March 25, 1993, leaving only his Section 1983 claims against Judge Mayer ("Defendant" or "Judge") for adjudication. The Defendant now moves the Court to grant summary judgment in his favor. For reasons that will be explained below, the Defendant's motion is granted in part and denied in part.

## I. BACKGROUND

The Plaintiff, who is a black male and a Jehovah's Witness, began his employment with the Defendant as a bailiff on August 22, 1989. On September 7, 1990, the Judge terminated the Plaintiff's employment after a year that both sides admit was not quiescent. Apparently, the Plaintiff failed to win the esteem of his coworkers, a situation which led to frequent squabbles in chambers among the Judge's staff concerning division of labor, lunch and rest breaks, and other matters that one would hope adults could settle among themselves without having to seek the intervention of a superior, in this case the Judge. Justified or not, it was not long after the Plaintiff began working as a bailiff that the Judge began to receive unsettling reports from his staff about the Plaintiff's behavior. These included recountings of the Plaintiff attempting to obtain the telephone numbers of females who appeared in the Judge's court or who happened to be walking in the corridors of the courthouse, *see* Mayer Deposition, at 87–89; leaving sexually suggestive materials in court, *see id.* at 93; proselytizing his religious beliefs during work hours, *see id.* at 175, including reading the Bible in the courtroom and its public reception area, *see id.* at 178–80, 190, 221, and preaching and reading the Bible to prisoners who were in a holding cell waiting to appear before the Judge, *see id.* at 177; failing to answer the telephone, *see id.* at 228; arriving late for work, *see id.* at 82; and creating a disturbance with court security officers, *see id.* at 103. These problems prompted the Judge to present the Plaintiff with a letter in June, 1990 warning him that "any continuance of the matters set out in this letter will result in your dismissal." Defendants' Exhibit A. The Judge identified six problem areas that warranted the Plaintiff's immediate attention: (1) "Witnessing", (2) "Reading Materials", (3) "Working Hours", (4) "Lunch Hour", (5) "Phones" and (6) "Absence during working hours." *Id.* In the Judge's view, the Plaintiff failed to make adequate progress modifying his behavior, resulting in his dismissal on September 7, 1990.

The Plaintiff believes that he was subjected to a hostile work environment and dis-

charged because of his race and religious beliefs. He contends, *inter alia.,* that he fell out of the Judge's favor after he refused to contribute a portion of his salary to the Republican Party and did not work at the polls on election day. His complaint sets forth claims against the Defendant for violation of his rights to freedom of religion, liberty, political affiliation and association, equal protection, and due process of law. The Court will address each of these allegations individually after describing the standard for evaluating the Defendant's motion.

## II. ANALYSIS

### A. *Summary Judgment Standards*

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the movant shows by pleadings, discovery, and affidavits that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Renovitch v. Kaufman,* 905 F.2d 1040, 1044 (7th Cir.1990). To survive summary judgment, the nonmovant must present affirmative evidence about what might be adduced at trial and may not rely on conclusory allegations or speculation. *Cain v. Lane,* 857 F.2d 1139, 1142 (7th Cir. 1988); *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 465 n. 8 (7th Cir.1986), *cert. denied,* 479 U.S. 1066, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987). The Plaintiff must "present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material fact exists, the court construes all evidence in the light most favorable to the party opposing the motion for summary judgment. *Oxman v. WLS–TV,* 846 F.2d 448, 452 (7th Cir.1988). "[A]t the summary judgment stage the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511. In other words, "[t]he trial court ... cannot resolve factual disputes that could go to a jury at trial, but weak factual claims can be weeded out

through summary judgment motions." *Collins v. Associated Pathologists, Ltd.,* 844 F.2d 473, 476 (7th Cir.1988). The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2551–52, 91 L.Ed.2d 265 (1986). Thus, the Defendant has the burden of proving that the material facts are not in dispute and that he is entitled to summary judgment as a matter of law. The Plaintiff then must " 'set forth specific facts showing that there is a genuine issue for trial.' " *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511, *quoting,* Fed.R.Civ.P. 56(e).

### B. *The Plaintiff's Claims*

#### 1. *Religious Discrimination*

The Plaintiff's complaint and Response Brief provide the Court with little guidance as to the precise legal theory that supports his religious discrimination claims. Although he frequently refers to the First Amendment, he does not differentiate between the Free Exercise and Establishment Clauses; the Court will assume that he intends to proceed under both clauses.

##### a. *The Free Exercise Claim*

The Free Exercise Clause of the First Amendment of the United States Constitution, which has been made applicable to the States by incorporation into the Fourteenth Amendment, *see Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." The free exercise analysis begins with an examination of "whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden." *Hernandez v. C.I.R.,* 490 U.S. 680, 699, 109 S.Ct. 2136, 2148, 104 L.Ed.2d 766 (1989). When making this inquiry, the court must be mindful that:

> [t]he Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens. Just as the Govern-

ment may not insist that [the plaintiffs] engage in any set form of religious observance, so [they] may not demand that the Government join in their chosen religious practices....

*Bowen v. Roy,* 476 U.S. 693, 699–700, 106 S.Ct. 2147, 2152, 90 L.Ed.2d 735 (1986). Here, the Plaintiff alleges that the Judge violated the Free Exercise Clause by preventing him from reading the Bible. *See* Response Brief, at 10. That allegation is a bit disingenuous, however, since the record is clear that the Judge *did not* bar the Plaintiff from reading the Bible. Rather, he forbid the Plaintiff from reading the Bible and evangelizing *while in court and in the court's public areas. See* Defendant's Exhibit A, at 1. The Judge did not disapprove of the Plaintiff reading his Bible in the privacy of the jury room. *See* Mayer Deposition, at 180. There is no indication from the Plaintiff that reading the Bible or proselytizing *in the court's public areas* is a "central religious belief or practice" for him. *Hernandez,* 490 U.S. at 699, 109 S.Ct. at 2148. The Free Exercise Clause is not a guarantee against inconvenience. Instead, it prevents government from interfering with the exercise of religious beliefs or practices that, by their nature, are fundamental to the particular adherent's religious sect. No such burden is implicated in this record. At a minimum, the Plaintiff remained free to study the Bible and to evangelize while not working.

The facts in this matter are easily distinguished from cases where the courts have sustained free exercise challenges: the latter have entailed a much greater infringement on religious freedom than that found here. *See, e.g., Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (requiring Amish children to attend school after the 8th grade); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (denying unemployment benefits to Seventh Day Adventist who refused to accept work requiring her to violate the Sabbath); *Thomas v. Review Board, Indiana Employment Security Division,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) (denying unemployment benefits to applicant whose religion forbade him to fabricate weapons). Accordingly, the Plaintiff's interest in the earlier described

religious activity can not be deemed "substantial" in a constitutional sense, and his free exercise claim must be dismissed.

### b. *The Establishment Claim*

■ In *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the U.S. Supreme Court set forth a three-part test for determining the constitutionality of state action that is challenged pursuant to the Establishment Clause. First, the state action must have a secular purpose. Second, its primary purpose must neither advance *nor inhibit* religion. Finally, the state action must not produce excessive government entanglement with religion. *Id.,* at 612–13, 91 S.Ct. at 2111. The first two criteria require that government remain neutral with respect to religion:

> The purpose prong of the *Lemon* test asks whether government's actual purpose is to endorse or disapprove of religion. The effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval. An affirmative answer to either question should render the challenged practice invalid.

*Wallace v. Jaffree,* 472 U.S. 38, 56 n. 42, 105 S.Ct. 2479, 2490 n. 42, 86 L.Ed.2d 29 (1985), *quoting, Lynch v. Donnelly,* 465 U.S. 668, 690, 104 S.Ct. 1355, 1368, 79 L.Ed.2d 604 (1984).

The Plaintiff contends that the Judge showed hostility toward his religion when he refused to allow him to read the Bible at his desk in the reception area of the court even though he permitted other court staff to read newspapers and other materials. *See* Plaintiff's Brief, at 15. The Judge argues that his instructions to the Plaintiff not to read the Bible in the court's public areas or to discuss his religious beliefs with visitors to the court were justified by the court's interest in not conveying an impression to the public that it endorsed a particular religious belief. *See* Defendant's Brief in Support of Motion for Summary Judgment, at 10–11. In the Judge's view, the Plaintiff's behavior, if allowed to continue, would violate Indiana's Judicial Code of Conduct by, *inter alia.,* creating an appearance of impropriety. *Id.*

**732**

■ Whether the Judge was correct in his assessment concerning the Establishment Clause is not an issue that this Court needs to reach if the restrictions that he imposed on the Plaintiff were neutral vis a vis religion. *See Jaffree, supra.* This inquiry requires the Court to focus on the first two criteria in the *Lemon* test, *supra.* As concerns the Judge's "actual purpose" in imposing the restrictions at issue, the record contains no evidence indicating that his objective was to disapprove of the Plaintiff's faith or disparage his beliefs, thereby violating the "purpose prong" of the *Lemon* test. Rather, the undisputed evidence indicates that the Judge's only concern was one of appearances, how the Plaintiff's behavior would reflect on his court. Under the circumstances, such a concern is not unreasonable since the Supreme Court has held that the state is constitutionally required to ensure that state-supported activity is not used for religious indoctrination. *See Lemon,* 403 U.S. at 619, 91 S.Ct. at 2114; *Levitt v. Committee for Public Education & Religious Liberty,* 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973). The Judge's conduct satisfies the "purpose prong" of the *Lemon* test.

■ The second part of the *Lemon* test, the "effect prong," requires the Court to examine whether the Judge's restrictions on the Plaintiff's religious activities convey a message of disapproval. *Id.* Again, the uncontroverted evidence is that the Judge took no action which disfavored a particular religious faith. His ban was neutral: his staff was not to engage in devotional activities or to evangelize in the court's public areas, including the holding cell for prisoners. The primary effect of these restrictions was not to disparage Christianity per se; it was to guarantee that the court retained its character as a place where secular laws are administered. The Judge explained his views in his deposition:

Q And the nature of the conversation, or the thrust of it, or the substance of it was you said what and he said what?

A Was that I had no objection to anyone reading the Bible or to promoting their religion, but it could not and must not be done within the confines of the court.

Q And what did he say, if anything, in response?

A "Well, everybody else is out there reading. So and So is reading the newspaper. Holly is reading her paperbacks."

And I told him that you may read the newspaper, you may read your paperbacks, or if you're in school you may read your textbooks, but if you're going to read the Bible or a religious—not necessarily. I guess you could read the Koran. But if you are going to read a religion, I guess, you may go back and use the jury room. You can sit back there and read it all day. You know. If you're not needed out in the thing, but it must be done in private. It cannot be done in the confines of the reception area and/or in the courtroom and/or back in the cells because it gives the question or it raises the question, or in my mind, it's a violation, a clear violation of what I am held to as the judge and what the court is held to as promoting religion.

Mayer Deposition, at 180. Very similar facts were presented to the Tenth Circuit Court of Appeals in *Roberts v. Madigan,* 921 F.2d 1047 (10th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 3025, 112 L.Ed.2d 896 (1992). In that case, a fifth grade school teacher and several parents sought damages, injunctive and declaratory relief against school officials who removed the Bible from the school library, removed religiously oriented books from the teacher's classroom library, and ordered the teacher not to display his Bible in the classroom or to read it silently during classroom hours. After summarizing the relevant Establishment Clause jurisprudence, the Court held that the school district's actions were not disapproving of Christianity and that its conduct did not violate the First Amendment:

Considering the evidence, we affirm the district court's finding that the primary effect of the school's actions was not to disapprove of Christianity. The mere fact that the actions were aimed exclusively at Christian religious materials does not automatically mean the actions' primary effect

was to send a disapproving message regarding Christianity. If we must draw any message from the actions, that message must be that the school district disapproves of the teaching of Christianity in the public schools. Here, we are particularly mindful, as was the district court, that there is a "difference between teaching about religion, which is acceptable, and teaching religion, which is not." *Roberts v. Madigan,* 702 F.Supp. 1505, 1517 (D.Colo. 1989). [The teacher's] avowed purpose for reading his Bible in class was to model reading for the students. Because [the teacher] chose to keep his Bible on his desk continuously and read it frequently, [the school principal] feared that [the teacher] was setting a Christian tone in his classroom. Having formed that impression, [the principal] had a duty to take corrective steps, and to do so in a religiously neutral manner. [The principal's] only stated reasons were that the Christian books and the Bible might violate "separation of church and state" and that "religion may not be taught in public school." We discern no anti-Christian message here. The school district's conduct thus satisfies the "primary effect" test as well as the "purpose" test under *Lemon.*

*Roberts,* 921 F.2d at 1055–56. In the same way, if this Court is to draw any message from the Judge's conduct, it is that he did not want "a religious tone" in his courtroom. *Id.* The reason that he has offered in support of his restrictions on the Plaintiff is that his behavior threatened to compromise the appearance of impartiality of the court. Because it would have been a clear violation of the doctrine of separation of church and state to use the court as a forum for *any* form of religious indoctrination, Christian or otherwise, the fact that the Judge imposed the restrictions in question itself evinces no hostility or disapproval of the Plaintiff's religion. This finding is consistent with the Court's earlier holding that these restrictions did not amount to a "substantial burden" on the Plaintiff's beliefs. The *de minimis* nature of the burden reflects its innocuous effect.

The Plaintiff does not suggest that the Judge's activities entailed any excessive entanglement of the state with religion, the third part of the *Lemon* test. Thus, to the extent that the Plaintiff's complaint sets forth a claim for violation of the Establishment Clause, that claim is dismissed.

2. *The Plaintiff's "Liberty" Interest*

Although Count I of the complaint alleges that the Defendant violated the Plaintiff's right to "liberty," he does not specify what that liberty interest is. The Court therefore will assume that the Plaintiff is attempting to say that he had a substantive due process interest in being able to read his Bible and evangelize while working in the court.

 The "substantive" component of the Fourteenth Amendment's due process clause protects against unreasonable government encroachment on the liberties of its citizens. To prevail on a substantive due process claim, the Plaintiff must establish that a state actor has deprived him of an underlying liberty interest. *See, e.g., Illinois Psychological Ass'n v. Falk,* 818 F.2d 1337, 1342 (7th Cir.1987). The precise identification of this right is quite important since not all liberty interests are entitled to the same degree of judicial scrutiny. For example, the right to fly a kite pales in comparison to the right to vote or to attend a church; the standard which the Court would apply in evaluating these respective claims accordingly is not the same. The underlying rights implicated by the Plaintiff's claim that he has a liberty interest in reading his Bible and evangelizing while at work are freedom of speech and freedom of religion. These rights are guaranteed by the First Amendment and, as such, they are deemed to be "fundamental rights," or rights which are entitled to the highest level of judicial scrutiny. A government policy that burdens a fundamental right can only be justified by a "compelling" state interest. *See Bowman v. Niagara Mach. and Tool Works, Inc.,* 832 F.2d 1052, 1054 (7th Cir.1987).

 The Court has already held, however, that the Judge's behavior did not tread on liberties guaranteed by the Establishment and Free Exercise Clauses of the First Amendment, *supra,* which leaves the freedom of speech claim for evaluation. As the Court has already explained, the undisputed

evidence indicates that the Judge's restrictions were not disapproving of the Plaintiff's beliefs, they merely preserved the secular integrity of the court. As the Supreme Court explained in *International Society for Krishna Consciousness v. Lee*, —— U.S. ——, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992):

> [I]t is well settled that the government need not permit all forms of speech on property that it owns and controls. Where the government is acting as a proprietor, managing its internal operations, rather than acting as lawmaker with the power to regulate or to license, its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject.

*Id.*, at ——, 112 S.Ct. at 2706 (citations omitted). When assessing restrictions that the government seeks to impose on the use of property, such as the ones at issue in this matter, the Supreme Court utilizes a "forum-based" approach. In places that have traditionally been available for public expression, such as public parks and streets, regulations on speech are subject to the highest scrutiny and survive only if they are narrowly drawn to achieve a compelling state interest. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983). The second category of public property is the designated public forum, which is property that the state has opened for expressive activity by part or all of the public. *Id.* Regulation of such property is subject to the same restrictions as that governing a traditional public forum. *Id.*, at 46, 103 S.Ct. at 955. Limitations on expressive activity conducted in all remaining kinds of public property must survive only a much more limited review. In *Perry*, the Supreme Court elaborated on the standard to be used when evaluating restrictions on speech in a nonpublic forum:

> Public property which is not by tradition or designation a forum for public communication is governed by different standards.

We have recognized that the 'First Amendment does not guarantee access to property simply because it is owned or controlled by the government.' In addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view. As we have stated on several occasions, ' "[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.' "

*Perry*, 460 U.S. at 46, 103 S.Ct. at 955 (citations omitted). The Court then explained the parameters of permissible restrictions based on the speech's subject matter:

> Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity. These distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property. The touchstone for evaluating these distinctions is whether they are reasonable in light of the purpose which the forum at issue serves.

*Perry*, 460 U.S. at 49,[1] 103 S.Ct. at 957.

 A courtroom is a not a public forum or a designated public forum. *See, e.g., Claudio v. U.S.*, 836 F.Supp. 1219 (E.D.North Carolina, 1993) (finding that a courthouse lobby is a nonpublic forum). While the public has ready access to the courts, that is not dispositive for purposes of the public forum inquiry; a public forum is *not* created "whenever members of the public are permitted freely to visit a place owned or operated by the Government." *Greer v. Spock*, 424 U.S. 828, 836, 96 S.Ct. 1211, 1216, 47 L.Ed.2d 505 (1976). The decision to cre-

---

**1.** As the Supreme Court explained in *Cornelius v. NAACP Legal Defense and Educ. Fund*, 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985): "Even protected speech is not equally permissible in all places and at all times. Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Id.*, at 799–800, 105 S.Ct. at 3447.

ate a public forum must instead be made "by intentionally opening a nontraditional forum for public discourse." *Lee,* —— U.S. at ——, 112 S.Ct. at 2706, *quoting, Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449. A courtroom is not a debate hall or a gathering place for the public to exchange ideas; it is a forum for adjudicating the rights and duties of litigants. In contrast to discourse in public fora, discussions that occur in court are highly regulated by rules of evidence and procedure. These are not characteristics of a public forum or designated public forum. *See Claudio, supra.*

Because the Judge's court is a nonpublic forum, his decision to limit the Plaintiff's devotional activities there need only be reasonable in light of the purpose which the court serves. *Perry,* 460 U.S. at 50, 103 S.Ct. at 958–59. By law, that purpose is secular and not religious. A limitation preserving the court's neutral religious posture therefore is entirely reasonable. The Plaintiff's claim for violation of his "liberty" is dismissed.

### 3. *Freedom of Association*

The Plaintiff's next claim is that the Defendant violated his right to "freedom of expression and/or freedom of political participation", *see* Plaintiff's Response Brief, at 18, when he was terminated allegedly for refusing to work at the polls on primary election day in May, 1990, and for refusing to contribute a portion of his salary to the Republican Party. The Court will construe this allegation as setting forth a claim for violation of the Plaintiff's right to freedom of association and analyze it according to the standards that the Supreme Court established in two of its leading freedom of political association cases, *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

In *Elrod,* a newly elected Democratic sheriff replaced certain office staff, including a bailiff, with favored members of his own party. The discharged workers brought a class action lawsuit against the sheriff, claiming violation of their First Amendment right to freedom of political association. The Su-

preme Court upheld a preliminary injunction against the sheriff. In a plurality opinion, the Court recognized the protections afforded by the right of association:

> There can no longer be any doubt that freedom to associate with others for the common advancement of political beliefs and ideas is a form of 'orderly group activity' protected by the First and Fourteenth Amendments. (citations omitted). The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom.

*Elrod,* 427 U.S. at 357, 96 S.Ct. at 2681, *citing, Kusper v. Pontikes,* 414 U.S. 51, 56–57, 94 S.Ct. 303, 307, 38 L.Ed.2d 260 (1973); *see also Rutan v. Republican Party of Illinois,* 497 U.S. 62, 76, 110 S.Ct. 2729, 2738, 111 L.Ed.2d 52 (1990) ("The First Amendment prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its employees' freedom to believe and associate, or to not believe and not associate."). The Court then examined the government's interests in patronage appointments and concluded that they are insufficient to justify the burden on First Amendment rights because they are not the least restrictive means for fostering those interests: "[I]f conditioning the retention of public employment on the employee's support of the in-party is to survive constitutional challenge, it must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights." 427 U.S. at 363, 96 S.Ct. at 2685.

Similarly in *Branti,* the Court ruled that the First Amendment prevented a newly appointed public defender, who was a Democrat, from discharging his assistants due to their lack of support from the Democratic Party. The majority noted, however, "that party affiliation may be an acceptable requirement for some types of government employment." 445 U.S. at 517, 100 S.Ct. at 1294. The proper inquiry in that determination "is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring

authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* at 518, 100 S.Ct. at 1295. Party affiliation is not an appropriate requirement for a bailiff. *See id.* at 517, 100 S.Ct. at 1294, *citing, Elrod,* 427 U.S. at 375, 96 S.Ct. at 2690. Therefore, the Plaintiff's constitutional right to freedom of association would be violated if political considerations motivated the Judge to terminate his employment. As *Elrod* and *Branti* make clear, *supra,* the Plaintiff had a constitutional right not to participate in political activities.

■ The Plaintiff has produced evidence which tends to show that the Judge valued partisan loyalty. The Plaintiff testified that during his initial interview for the bailiff position the Judge "suggested" that he fill out a political contribution card and donate two percent of his income to the Republican Party. *See* Kelly Deposition, at 129; Kelly Affidavit, at ¶ 6. The Judge flatly denies this allegation. *See* Mayer Deposition, at 198. He acknowledges, however, that he "discussed" with his staff their "obligation" to work at the polls on election day, though he denies that he told or ordered them to do so. *Id.* The Plaintiff also states that he was advised by one member of the Judge's staff that it was the Judge's policy to have everyone in the office work at the polls. *See* Kelly Deposition, at 127–128. In February, 1990, after the Plaintiff became a Jehovah's Witness, he decided not to participate in political activities, including sending a portion of his income to the Republican Party, working at the polls, or voting. These facts were made known to the Judge's staff, one of whom reportedly conveyed them to the Judge. *Id.;* Kelly Affidavit, at ¶¶ 12–13. The Plaintiff also relies on the timing of the Judge's warning letter, which followed the primary election by approximately one month, as circumstantial evidence of the Judge's bias.

■ Whether the Plaintiff's lack of enthusiasm for things political had any bearing on the Defendant's decision to terminate him is not within the province of this Court to decide at this juncture. Motive or intent is a quintessential question of fact, *see Greider v. Duckworth,* 701 F.2d 1228, 1232 (7th Cir.

1983), which the Court is unable to resolve when passing on a motion for summary judgment. *See Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."). Whether the Judge violated the Plaintiff's right to freedom of association is a question of fact properly left for the jury to decide.

### 4. *Equal Protection*

■ The Plaintiff's equal protection claim is based on alleged disparate treatment of two different sorts: one racial and the other religious. In terms of the latter, the Plaintiff identifies himself as a member of a class of persons who read the Bible, *see* Plaintiff's Response Brief at 14, and contends that the Judge violated his right to equal protection when he refused to allow him to read the Bible in the public areas of the courtroom. This Court has already held that the Plaintiff has not suffered a deprivation of rights guaranteed under the Establishment and Free Exercise Clauses of the First Amendment. Because the Plaintiff has failed to make a showing that the Judge burdened a fundamental religious right, to pass constitutional muster the restrictions that he imposed on the Plaintiff's beliefs need only be rationally related to a legitimate state purpose. *See generally,* Nowak et al., Constitutional Law, at 591 (1983). The undisputed evidence indicates that the Judge prevented the Plaintiff from reading his Bible and evangelizing in the public areas of the courtroom to preserve the secular nature of that forum. Such a purpose is legitimate and the restrictions that he imposed on the Plaintiff are rationally related to achieving it, *supra.* The Supreme Court has held that the state is constitutionally required to ensure that state-supported activity, which includes the work of the courts, is not used for religious indoctrination. *See Lemon,* 403 U.S. at 619, 91 S.Ct. at 2114. The restrictions in question further that goal by upholding the separation of church and state.

To the extent that the Plaintiff contends that the Judge denied him equal protection

by terminating his employment because of his race, that claim must be denied because there is not one scintilla of evidence in the record which supports such a conclusion. The Plaintiff's equal protection claim is not limited to that charge, however; he also alleges that the Judge was indifferent to racial and religious harassment that members of the Judge's staff and others inflicted on him at the courthouse. *See* Plaintiff's Response Brief, at 23.

In general, the standard for evaluating a § 1983 claim for violation of equal protection based on harassment in the workplace is the same as for a Title VII claim. *See King v. Board of Regents of Univ. of Wisconsin System,* 898 F.2d 533, 537 (7th Cir.1990). The Supreme Court has adopted a two-tiered test for determining whether a hostile work environment exists, consisting of an objective and a subjective tier:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Harris v. Forklift Sys., Inc.,* —— U.S. ——, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). The circumstances which indicate a hostile environment may be such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.,* at ——, 114 S.Ct. at 371. Moreover, the harassment must be "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405. Conduct that is merely offensive does not offend Title VII or the Equal Protection Clause. *Id.,* —— U.S. at ——, 114 S.Ct. at 370; *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405. A "'mere utterance of an ... epithet

which engenders offensive feelings in an employee,' does not sufficiently affect the conditions of employment to implicate Title VII." *Harris,* —— U.S. at ——, 114 S.Ct. at 370, *quoting, Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405. Indeed, "occasional or sporadic instances of racial or ethnic slurs do not in and of themselves constitute a violation of Title VII." *Nazaire v. Trans World Airlines, Inc.,* 807 F.2d 1372, 1380 (7th Cir.1986), *cert. denied,* 481 U.S. 1039, 107 S.Ct. 1979, 95 L.Ed.2d 819 (1987); *see also Meritor,* 477 U.S. at 57, 106 S.Ct. at 2400. To this list also must be added the element of intent, since one difference between an equal protection and Title VII harassment claim is that the defendant must intend to harass under the former but not the latter. *See King,* 898 F.2d at 537; *see also Trautvetter v. Quick,* 916 F.2d 1140, 1149 (7th Cir.1990); *Huebschen v. Dept. of Health and Social Services,* 716 F.2d 1167, 1171 (7th Cir.1983). Thus, to prevail on his claim, the Plaintiff must not only show that he was harassed within the meaning of the previously described standards, he must also demonstrate that the Defendant intended to harass him because of his race and religious beliefs.

The means available to the Plaintiff to demonstrate the Defendant's intent are not limited to evidence of his direct participation in the harassment. In *Crowder v. Lash,* 687 F.2d 996 (7th Cir.1982), the Seventh Circuit explained:

> [A] defendant's direct participation in the deprivation [of a constitutional right] is not required. An official satisfies the personal responsibility requirement of section 1983 if she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent.

*Id.* at 1005; *see also Volk v. Coler,* 845 F.2d 1422, 1431 (7th Cir.1988).

The alleged acts that the Plaintiff cites as evidence of racial or religious discrimination do not satisfy the standards that the Supreme Court and Seventh Circuit have established to identify hostile work environments. The Plaintiff complains that his co-workers criticized him for being celibate, *see*

Kelly Deposition., at 68–75, 79–80, 87–91; Kelly Affidavit, at ¶ 15; for being incompetent, *see* Kelly Deposition., at 77–78; for falsifying his time card, *see* Kelly Deposition., at 92–95; for leaving a sexually suggestive, religious poem on a co-worker's desk, *see* Kelly Deposition., at 80–88; and generally treating him discourteously. *See* Kelly Deposition., at 80. He also complains that the other court employees did not cooperate with him, though he acknowledges that this was due in part to his protests about their smoking habits. *See* Kelly Deposition., at 96–97. These behaviors simply do not rise to the level of abuse that characterize a "hostile working environment." The Plaintiff's co-workers may have made "offensive utterances" to the Plaintiff, but as already explained, a " 'mere utterance of an ... epithet which engenders offensive feelings in an employee,' does not sufficiently affect the conditions of employment to implicate Title VII" or the Equal Protection Clause. *Harris,* —— U.S. at ——, 114 S.Ct. at 370, *quoting, Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405. The Plaintiff's description of his working environment focuses on a limited number of isolated events rather than on a course of conduct that could be considered to be "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405. It is also worth noting that linkage between the offensive conduct that the Plaintiff describes and his race or religion is tenuous at best. For example, he contends that his co-workers discriminated against him based on his race because he opposes sex before marriage. *See* Kelly Deposition., at 80. Given these findings, it is impossible to say that the Judge acted "with a deliberate or reckless disregard of plaintiff's constitutional rights," or that any constitutional deprivation occurred at his direction or with his knowledge and consent. *Crowder,* 687 F.2d at 1005. There is no evidence that the Judge intentionally discriminated against the Plaintiff. Accordingly, the Plaintiff's equal protection claims are dismissed.

### 5. *Due Process*

In Count II of his complaint, the Plaintiff alleges that he was deprived of his employment without due process. The Court construes Count II as setting forth claims for violation of his right to both procedural and substantive due process. *See Black v. Lane,* 22 F.3d 1395, 1402 (7th Cir.1994) ("An allegation of deprivation of due process rights states a claim under both procedural and substantive due process.").

■ In evaluating a procedural due process claim, a court must consider three factors: (1) whether the plaintiff has a protected interest that was affected by the adverse action complained of, and the nature of that interest; (2) the risk that the plaintiff was erroneously deprived of that interest, and the amount by which additional procedures would have reduced that risk; and (3) the government's interest in, or reason for, failing to have provided additional procedural safeguards. *Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976); *Birdsell v. Board of Fire & Police Commissioners,* 854 F.2d 204, 207 (7th Cir. 1988). Unfortunately for the Plaintiff, the first factor presents an insurmountable obstacle. In the employment context, a plaintiff's protected property interest—defined as a legitimate expectation of continued employment—can be created in one of four ways: (a) express contract, (b) implied contract, (c) state law, or (d) some other "mutually explicit understanding" between an employer and an employee. *Thornton v. Barnes,* 890 F.2d 1380, 1386 (7th Cir.1989); *Davis v. City of Chicago,* 841 F.2d 186, 188 (7th Cir.1988). For example, a public employee hired pursuant to an employment contract has a property interest in his continued employment which is safeguarded by due process of law during the term of the contract. *See Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 576–77, 92 S.Ct. 2701, 2708–09, 33 L.Ed.2d 548 (1972), *citing, Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952); *see also Birdsell v. Litchfield Board of Fire & Police Commissioners,* 854 F.2d 204, 208 (7th Cir.1988) ("The Supreme Court has recognized that the property interest that is implicated when a public employer terminates an employee with legitimate expectations of job security is an especially

weighty one"). The problem for the Plaintiff is that the record contains no evidence indicating that he had an employment contract or any "legitimate expectations of job security." Under Indiana law, there are two basic kinds of employment relationships: employment at will and employment for a definite term. *See, e.g., Mead Johnson and Co. v. Oppenheimer,* 458 N.E.2d 668 (Ind.App. 1984); *Peterson v. Culver Educational Foundation,* 402 N.E.2d 448 (Ind.App.1980). An employee at will can be terminated at any time with or without cause. *See Oppenheimer,* 458 N.E.2d at 670. There is a rebuttable presumption in Indiana that employment is at will. *See Speckman v. City of Indianapolis,* 540 N.E.2d 1189, 1192 (Ind.1989). The Plaintiff has presented no evidence that would overcome this presumption; there is no indication in the record that the Judge offered him his position for a definite term or that he is entitled to special statutory protection. Nor is the Court's policy manual any help to the Plaintiff's cause. Without a promise of employment for a definite term, policy manuals and handbooks are not a source of procedural guarantees. *See Colburn v. Trustees of Indiana University,* 739 F.Supp. 1268, 1287 (S.D.Ind.1990), *aff'd,* 973 F.2d 581 (7th Cir.1992); *Tri–City Comprehensive Community v. Franklin,* 498 N.E.2d 1303, 1306 (Ind.App.1986). Accordingly, the Plaintiff's due process claim is dismissed.

Besides procedural due process, the Seventh Circuit has acknowledged that substantive due process claims can also be brought to protect property interests. *See New Burnham Prairie Homes, Inc. v. Village of Burnham,* 910 F.2d 1474, 1480 (7th Cir.1990). To state a claim for the violation of substantive due process, the Plaintiff, "in addition to alleging that the decision [to deprive him of his property] was arbitrary and irrational, ... 'must also show either a separate constitutional violation or the inadequacy of state law remedies.'" *Id.,* at 1480, *quoting, Polenz v. Parrott,* 883 F.2d 551, 558 (7th Cir.1989). The Court's analysis has revealed, however, that the only alleged constitutional violation that remains an issue in this case is the Plaintiff's claim in Count I of the complaint that the Defendant violated his right to freedom of association. To the ex-

tent that the Plaintiff is attempting to rely on other alleged constitutional violations to support claims that his right to substantive due process was violated, they are dismissed.

### C. *Collateral Estoppel*

The Plaintiff's last argument is that the Defendant is precluded from litigating factual issues that were decided in an administrative proceeding before the Indiana Department of Employment and Training Services. *See* Plaintiff's Response Brief, at 5. Collateral estoppel precludes relitigation of issues in subsequent proceedings when:

1) the party against whom the estoppel is asserted was a party to the prior adjudication;

2) the issues which form the basis of the estoppel were actually litigated and decided on the merits in the prior suit;

3) the resolution of the particular issues was necessary to the court's judgment; and

4) those issues are identical to issues raised in the subsequent suit.

*Bone v. City of Lafayette,* 919 F.2d 64, 66 (7th Cir.1990), *citing, Webb v. State,* 453 N.E.2d 180 (Ind.1983); *Amoco Oil Co. v. Johnstone,* 856 F.2d 967, 969 (7th Cir.1988), *quoting, County of Cook v. MidCon Corp.,* 773 F.2d 892, 898 (7th Cir.1985); *see also Button v. Harden,* 814 F.2d 382, 383–85 (7th Cir.1987). The Defendant, however, was not a party to the prior proceeding before the Indiana Department of Employment and Training Services. *See* Defendant's Reply Brief, at 10. Nor is the issue which was presented there—whether the Plaintiff was discharged for "just cause" within the meaning of Chapter 15, Section 1 of the Indiana Employment and Training Services Act— identical to the issues presented in this cause. *See* Plaintiff's Exhibit 6. The Plaintiff's collateral estoppel argument is without merit.

### CONCLUSION

The Defendant's motion for summary judgment is granted in part and denied in part. The Plaintiff's freedom of association claim in Count I of his complaint, and his

substantive due process claim in Count II, survive summary judgment. The remaining claims in the Plaintiff's complaint are dismissed with prejudice.

It is so ORDERED.