74 F.3d 138
 69 Fair Empl.Prac.Cas. (BNA) 1183,
67 Empl. Prac. Dec. P 43,836
Peter C. AMERICANOS, Plaintiff-Appellant,
v.
Pamela CARTER, in her personal capacity and in her official
capacity as the Attorney General of Indiana, Dennis P. Lee,
in his personal capacity and in his official capacity as
Chief of Staff of the Attorney General of Indiana, David
Hamilton, in his personal capacity, et al., Defendants-Appellees.
 No. 95-1156.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 19, 1995.
Decided Jan. 9, 1996.
 
 Robert C. Perry, argued, Indianapolis, IN, for Peter C. Americanos.
 Hudnall A. Pfeiffer, argued, Mark J. Sifferlen, Baker & Daniels, Indianapolis, IN, for Pamela Carter.
 Pamela Carter, Office of The Attorney General, Indianapolis, IN, for Dennis P. Lee and State of Ind.
 Before CUMMINGS, BAUER and COFFEY, Circuit Judges.
 COFFEY, Circuit Judge.
 
 
 1
 Peter C. Americanos was terminated from his position as a Deputy Attorney General ("DAG") for the State of Indiana. He filed suit in district court claiming that he was discharged because he was (1) affiliated with the Republican Party, (2) a Caucasian male of Greek origin, and (3) fifty-two. The defendants filed a motion to dismiss, arguing that Americanos failed to state a claim upon which relief could be granted. Fed.R.Civ.P. 12(b)(6). The district court granted the defendants' motion and Americanos appeals. We AFFIRM.
 
 I. FACTUAL BACKGROUND
 
 2
 Americanos, who was born in the Republic of Greece in 1941 and became a naturalized American citizen in 1972, was a DAG for the State of Indiana from June 11, 1973, until February 19, 1993. On November 3, 1992, Pamela Carter, a Democrat, was elected Attorney General ("AG") of the State of Indiana. Carter's campaign included promises to recruit "bright young lawyers" and "new solid law school graduates" for the position of DAG, and to encourage "youthful talent."
 
 
 3
 Carter's transitional director, David Hamilton, assisted her in assessing which employees were worthy of retention, but he never held a position within Carter's administration. Carter selected Dennis P. Lee to be her Chief of Staff of the Attorney General, and he too aided Carter in composing her staff.
 
 
 4
 Immediately prior and subsequent to the time when Carter assumed her office, Americanos alleged that a number of employees, almost all of whom were white, male, Republicans, over the age of forty, were "told to resign from their positions." On February 3, 1993, Lee approached Americanos and asked him to submit his resignation by February 19, 1993. The plaintiff inquired of Lee as to why he was being discharged, and according to Americanos, Lee merely stated that he "did not meet the goals of the new Attorney General." When Americanos pressed Lee to elaborate on what those goals were, Lee allegedly responded that "they were extensively reported in the press," and discussed the matter no further.
 
 
 5
 On February 15, 1993, Americanos sent a letter to Lee requesting that he state the reasons why he was being asked to resign, and on February 18 Lee responded, stating that the plaintiff's resignation "was requested after it was determined that your contributions to the operations of the office do not fit the expectations of the Attorney General." On February 19, the plaintiff handed in his letter of resignation, under protest.
 
 
 6
 Americanos filed a charge with the Equal Employment Opportunity Commission ("EEOC"), claiming that he was terminated because he is a Caucasian male of Greek origin. The plaintiff's complaint alleged that during the EEOC's investigation of the charges, Carter claimed that she requested the plaintiff's resignation because "he was identified as not having the skills or traits necessary to achieve the goal of providing first class legal representation to the State of Indiana and because he was insufficiently 'enthusiastic' in regard to [her] stated goal of improving the quality of legal representation provided by the Attorney General."[1]
 
 
 7
 Americanos filed suit against Carter, Hamilton, Lee and the State of Indiana, claiming that he was dismissed because he was: (1) a Caucasian male of Greek origin, in violation of Title VII, 42 U.S.C. Sec. 2000e, et seq., (2) a member of the Republican party, in violation of 42 U.S.C. Sec. 1983, as well as his First and Fourteenth Amendment right to freedom of association, and (3) fifty-two years old, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. Sec. 621, et seq.
 
 
 8
 The defendants filed a motion to dismiss, arguing that Americanos' complaint failed to state a claim upon which relief could be granted, Fed.R.Civ.P. 12(b)(6), which the district court granted. Americanos appeals.
 
 II. ISSUES
 
 9
 Americanos appeals two issues: (1) whether the district court committed error when it determined that the position of DAG is one for which political party affiliation is an appropriate requirement for the effective performance of the DAG's duties; and (2) whether the court committed error when it found that a DAG is not an "employee" under Title VII or the ADEA.
 
 III. DISCUSSION
 
 10
 We review a Fed.R.Civ.P. 12(b)(6) motion for "failure to state a cause of action upon which relief can be granted" de novo. Kolman v. Sheahan, 31 F.3d 429, 431 (7th Cir.1994). "In our review, we take the well-pleaded allegations of the complaint as true, and we consider the facts alleged in the light most favorable to the non-moving party." Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund, 25 F.3d 417, 420 (7th Cir.1994) (citations omitted). "We will affirm the court's dismissal if it appears beyond doubt that [the plaintiff] can prove no set of facts in support of his claim which would entitle him to relief." Kolman, 31 F.3d at 431 (quotation omitted, alteration in original).
 
 A. POLITICAL PATRONAGE
 
 11
 Americanos contends that the district court committed error when it determined that political party affiliation was an appropriate condition of employment for a DAG. He asserts that the duties and responsibilities of the approximately eighty DAGs in Indiana varied greatly and that political association was a valid job qualification for only five of the DAGs, who held the title of Chief Counsel. Americanos describes his position as non-political, non-controversial, and one which afforded him no opportunity to influence or define policy for the State of Indiana. He argues that his personal political views had no bearing on his ability to perform his job. Americanos further maintains that the district court had insufficient factual information before it concerning his specific duties as a DAG to grant the motion to dismiss.
 
 
 12
 "Although the practice of [political] patronage dismissals clearly infringes First Amendment interests, our inquiry is not at an end, for the prohibition on encroachment of First Amendment protections is not an absolute." Elrod v. Burns, 427 U.S. 347, 360, 96 S.Ct. 2673, 2683, 49 L.Ed.2d 547 (1976). The Supreme Court has recognized that "party affiliation may be an acceptable requirement for some types of government employment.... [I]f an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency." Branti v. Finkel, 445 U.S. 507, 517, 100 S.Ct. 1287, 1294, 63 L.Ed.2d 574 (1980) (citing Elrod, 427 U.S. at 366, 96 S.Ct. at 2686). The relevant inquiry in such cases is "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." Id. at 518, 100 S.Ct. at 1295; see also, Heideman v. Wirsing, 7 F.3d 659, 662-63 (7th Cir.1993). "Thus, only if political loyalty is 'essential to the discharge of the employee's governmental responsibilities,' can his patronage dismissal survive a First Amendment challenge." Tomczak v. City of Chicago, 765 F.2d 633, 640 (7th Cir.), cert. denied, 474 U.S. 946, 106 S.Ct. 313, 88 L.Ed.2d 289 (1985) (quoting Branti, 445 U.S. at 518, 100 S.Ct. at 1295).
 
 
 13
 "This court has elaborated the relevant inquiry in broad terms. The test is whether the position held by the individual authorizes, either directly or indirectly, meaningful input into governmental decision-making on issues where there is room for principled disagreement on goals or their implementation." Heideman, 7 F.3d at 663 (quotation and citations omitted). We have also made it clear that "Elrod require[s] [us] to examine the 'powers inherent in a given office,' rather than the actual functions of the occupant of that office performed." Heck v. City of Freeport, 985 F.2d 305, 309 (7th Cir.1993) (quoting Tomczak, 765 F.2d at 641).[2]
 
 
 14
 Contrary to the plaintiff's assertion, the district court did not assume that all DAGs hold the same position within the Office of the Attorney General. The court looked to the statutory scheme governing the Office of the Attorney General and recognized that each DAG may be authorized to "perform in behalf of ... the state any and all of the rights, powers or duties now or hereafter conferred by law or laws upon the attorney general." Ind.Code Ann. Sec. 4-6-5-1 (emphasis added). As such, the judge properly noted that a DAG could potentially be called upon to perform any of the enumerated duties of the AG, such as "prosecuting and defending suits by or against the state and state officers, defending suits against state governmental officials or employees or teachers, advising state officials through opinions, advising state agencies, [and] collecting outstanding debts owed to the state." The trial court further recognized that "[t]he deputy is the public representative of the office." Accord, Roberts v. State, 151 Ind.App. 83, 278 N.E.2d 285, 290 (1 Dist.1972) (a DAG acts in the name of the AG).
 
 
 15
 Americanos places great reliance on our opinion in Kolman, 31 F.3d 429, for the proposition that the district court should have denied the motion to dismiss based on an insufficient factual record. In Kolman, the discharged plaintiffs were deputies and investigators in the Cook County Sheriff's Electrical Monitoring Unit (EMU) who monitored the electronic tracking devices placed on prisoners who were released from the Cook County jail due to overcrowding. Id. at 430. This court determined that the EMU is an "obscure department" in the Cook County sheriff's office, and we noted that we could not even "resort to common knowledge to know about the plaintiff's job responsibilities." Id. at 432. Thus, we were unable to determine whether the deputies and investigators were positions for which political affiliation was an appropriate job requirement in the context of a motion to dismiss. Kolman is distinguishable from the case at bar, however, because the duties and responsibilities of a DAG are easily ascertainable from the Indiana Code. See Newcomb v. Brennan, 558 F.2d 825, 829 (7th Cir.), cert. denied, 434 U.S. 968, 98 S.Ct. 513, 54 L.Ed.2d 455 (1977) ("matters of public record such as state statutes ... fall within the category of 'common knowledge' ").
 
 
 16
 The plaintiff concedes in his appellate brief that there are certain DAGs who "hold positions for which party loyalty is an indispensable qualification for the effective performance of their duties," and argues that only "[t]hese deputies could be removed from their positions for political reasons." Because we must look to the "powers inherent in a given office, rather than the actual functions the occupant of that office performed," Heck, 985 F.2d at 309, Americanos' concession is fatal to his claim that his First and Fourteenth Amendment rights were violated, for if some DAGs can be terminated based on their political affiliation, all can be.
 
 
 17
 In light of the fact that the DAG acts on behalf of the State of Indiana, Americanos' position inherently carries with it the ability to have "meaningful input into governmental decision-making on issues where there is room for principled disagreement on goals or their implementation." Heideman, 7 F.3d at 663. Although Americanos asserts that he "was required to refer all issues and questions involving politics and/policy making to Chief Counsel," and let that person make the ultimate decision on how to implement the AG's goals, it is likely that in making such referrals Americanos was asked to advise his superiors concerning what his research into these issues revealed, and what he thought would be the correct course of legal action. The plaintiff's mere participation in these types of discussions establishes that he had "meaningful input" into deciding how to handle legal issues for the state. Furthermore, even if Americanos and his superiors agreed on the black letter of the law, there was certainly the potential for principled disagreement on which goals were primary in the AG's representation of the state and its interests, and how to achieve results consistent with those priorities.
 
 
 18
 Political loyalty to the AG is an "appropriate requirement for the effective performance" of the position of DAG, Branti, 445 U.S. at 518, 100 S.Ct. at 1295, because "elected officials cannot implement the policies that they were elected to carry out, and hence the will of the electorate cannot be effectuated, unless the officials can install their political allies in the most sensitive jobs." Selch v. Letts, 5 F.3d 1040, 1044 (7th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994) (quotation omitted). We have held that a Republican could be fired from his position as a subdistrict superintendent for the Indiana Department of Highways, which was headed by a Democratic director, because "an opposition party loyalist in the position in question could reasonably serve to threaten the policy goals of the party in power." Id. Selch, as subdistrict superintendent, was responsible for the direction and coordination of the maintenance for over 800 miles of highways within his district, and managed over 60 employees and a $1,000,000 budget. Id. Although Selch claimed that there was no room for principled disagreement over "which potholes were to be filled," we recognized that because Selch had "almost unbridled authority" to direct the work within his subdistrict, he was in a position to thwart the goals of the Director of the Department of Highways. Id. at 1045.
 
 
 19
 Although Americanos cannot be said to have unbridled authority in the performance of his job, the district court properly noted that "because it is impossible to monitor all the activities of the deputies, an opposition party loyalist in the position of deputy attorney general could reasonably serve to threaten the policy objectives of the attorney general." Additionally, in Tomczak we cautioned against applying a "myopic view of the role of politics in the seemingly a political context" of the City of Chicago's Water Department. 765 F.2d at 641. We stated that although the position of First Deputy of the Department involved only "mundane decisions concerning the repair and rehabilitation of the water systems, and [did not entail] decision-making authority in areas in which there could be principled disagreements about goals or their implementation," we recognized that even a Deputy with no policy-making authority still played a vital role in the implementation of the Director's goals. Id. This role was sufficiently tied to the Director's success or failure that we held political affiliation to be an appropriate job requirement. Id.
 
 
 20
 In Upton v. Thompson, 930 F.2d 1209 (7th Cir.1991), cert. denied, 503 U.S. 906, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992), we examined the issue of whether deputy sheriffs could be fired based on their political support of an opposition candidate. We answered that question in the affirmative, noting that "[g]iven the dependency of the sheriff (and his political survival) on his deputies' job performance, it is understandable why a sheriff might believe that party loyalty is an appropriate consideration for a deputy sheriff." Id. at 1216. So too does AG Carter's political tenure depend on her ability to successfully implement her goals and priorities, and she may validly assume that the political party affiliation of her DAGs will play a part in her success as AG.
 
 
 21
 In Livas v. Petka, we held that a prosecutor was "entitled to demand absolute loyalty from his assistants" and was permitted to dismiss any assistant in whom he had "lost confidence ... for whatever reasons," including political reasons. 711 F.2d 798, 801 (7th Cir.1983). In so holding, we stated that:
 
 
 22
 A public prosecutor ... exercises broad public responsibilities in the performance of his duties. A prosecutor's 'client' is not an individual, but society as a whole. And the prosecutor has the broad discretion to set whatever policies he or she believes necessary to protect the interests of society.
 
 
 23
 One of the problems faced by a prosecutor ... is that his policies are implemented by subordinates.... The public interest in the efficient administration of justice requires that decisions made by such assistant prosecutors conform with the broad objectives chosen by the prosecutor.
 
 
 24
 Id. at 800-01. Similar to the assistant prosecutors in Livas, DAGs have the direct ability to implement the policies and goals of the AG for the State of Indiana. As such, their political loyalty to the AG is of the utmost importance to the AG's confidence in her DAGs.
 
 
 25
 Finally, we note that the legislature of the State of Indiana also felt that it was important for an AG to employ the legal staff of his or her choosing for it provided that "[t]he attorney general shall have the power and authority to remove any deputy at any time," Ind.Code Ann. Sec. 4-6-5-1, and DAGs are exempt from state civil service laws. Ind.Code Ann. Sec. 4-15-2-3.8. The AG has the statutory right to hire and fire without cause. Indiana case law also tells us that an AG has no power to appoint a DAG for any longer than his or her own term of office. Roberts, 278 N.E.2d at 290. Thus, a newly elected AG, such as Carter, or one that is appointed for a specific term of office, is under no obligation to retain DAGs from the former administration, such as Americanos.
 
 
 26
 This court has had occasion to note that when dealing with a system of political patronage, "All they that take the sword shall perish with the sword." Upton, 930 F.2d at 1218 (quoting Matthew 26:51). Therefore, if Americanos' tenure with the Office of the Attorney General was terminated because he was a Republican,[3] he has failed to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6), because his First and Fourteenth Amendment right to freedom of association was not violated for his political party affiliation was an appropriate condition of his continued employment as a DAG, and he could be dismissed from his position without cause. Americanos was hired by a Republican AG and was retained in his position by successive Republican AGs. During that time, it is likely that qualified Democrats applied for positions as a DAG but were denied employment because the AG desired a staff of DAGs who were of a similar political persuasion to himself. Americanos benefitted from the patronage system for his entire legal career; he cannot now argue that the very patronage system which provided him with job security for twenty years is unconstitutional.
 
 B. EMPLOYEE STATUS UNDER ADEA AND TITLE VII
 
 27
 The ADEA and Title VII exempt certain public officials from their protections:
 
 
 28
 The term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate advisor with respect to the exercise of the Constitutional or legal powers of the office. The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency, or political subdivision.
 
 
 29
 29 U.S.C. Sec. 630(f); 42 U.S.C. Sec. 2000e(f). Americanos, in his appellate brief, concedes that the test for determining if someone is an "employee" within the definition of these two statutory schemes "is essentially indistinguishable from that applied in the political firing context under the Elrod/ Branti doctrine." Indeed, he is wise to do so for we have held that "the reasons for exempting the office from the patronage ban apply with equal force to the requirements of the ADEA [and Title VII]." Heck, 985 F.2d at 310. We hold that the district court properly dismissed Americanos' age, gender, and national origin discrimination claims, for a DAG is not an "employee" within the purview of either Title VII of the Civil Rights Act of 1964 or the ADEA.
 
 
 30
 AFFIRMED.
 
 
 
 [1]
 After investigation, the EEOC decided not to file suit and issued Americanos a right to sue letter, authorizing him to pursue a private action against the defendants
 
 
 [2]
 "We explained that the reason for so limiting the inquiry was two fold; first, to relieve courts of the burden of reevaluating the nature of a position every time a new administration changes the mix of responsibilities bestowed upon the officeholder; and second, to provide certainty to litigants." Heck, 985 F.2d at 309 (citing Tomczak, 765 F.2d at 641)
 
 
 [3]
 In their appellate brief, the defendants "steadfastly deny [that] Plaintiff was discharged because of his political affiliation or discriminated against on any unlawful basis," but because we are reviewing a motion to dismiss, we must take Americanos' allegations in his complaint as true. Arst, 25 F.3d at 420