Willard Neal **FLOWERS**, Jr., John T. **Domi,** and Paul S. **Tuttle,** Plaintiffs,

v.

Julia **CARSON,** individually, Mark Anthony **Duncan,** individually and in his official capacity as Center Township Constable; and Center Township of Marion County, Indiana, a municipal corporation, Defendants.

No. IP94–1797C B/S.

United States District Court, S.D. Indiana, Indianapolis Division.

Feb. 20, 1996.

Richard A. Waples, Ind. Civil Liberties Union, John Wood, Christopher Zoeller, Zoeller & Zoeller, Indianapolis, Indiana, for Plaintiffs.

Virginia Dill McCarty, Landman & Beatty, Indianapolis, Indiana, for Defendants.

## *ENTRY*

` BARKER, Chief Judge.

This is before the Court on Defendants' Alternative Motions for Summary Judgment. Defendants' motions are granted in part and denied in part.

## I. BACKGROUND

### A. Facts

This case involves allegations of political patronage in the office of the Center Township Constable in Marion County, Indiana. The Center Township Constable is an elected official who acts as court bailiff for the Marion County Small Claims Court, serves the Court's process, has police powers, and carries out orders of the Court. The Constable may appoint full and part time deputies, who serve at the Constable's pleasure, may be dismissed without cause, and are to be paid solely from service of process fees collected by the Court. *IC 33–11.6–8–4.*

Taylor Seaths ("Seaths") was first elected Center Township Constable on January 1, 1959. He ran for re-election every four years, up to his final resignation on July 9, 1993. He did not, however, serve continuously as Constable from 1959 until 1993, as he lost three elections during that time.[1] (Tuttle Aff. at ¶¶ 13, 14).

Plaintiff Paul Tuttle ("Tuttle") was appointed Deputy Constable by Seaths in 1960, and served in that capacity continuously until July 12, 1993. Each time a newly elected Constable took office, Tuttle's employment continued uninterrupted. He neither applied for re-hiring nor was he sworn in again, although with each election he was issued a new identification card bearing the name of the newly elected Constable. (Tuttle Aff. at ¶¶ 5–7).

Plaintiff John Domi ("Domi") was appointed Deputy Constable by Seaths in January 1986, and served in that capacity continuously until July 12, 1993. Upon each re-election of Seaths as Constable, Domi was neither required to apply for re-hiring nor to be sworn in again, although each time he was issued a new identification card. (Domi Aff. at ¶¶ 4–5).

Plaintiff Willard Neal Flowers' ("Flowers") official employment status with the Center Township Constable's office is somewhat less clear. It is undisputed that he performed some deputy constable duties, such as service of process and serving as bailiff of the Small Claims Court. Flowers was issued an identification card in 1992, identifying him as a Deputy Constable, and was issued "conditional equipment", such as a police radio, signature stamps, and official license plates which enabled him to carry out Deputy Constable duties. In addition to his Deputy Constable duties, Flowers also performed duties for Seaths personally, such as serving process which had previously been done by Seaths himself, and driving Seaths' car, since Seaths'

---

1. Seaths apparently served continuously as Constable from January 1986 until his resignation.

poor eyesight made him unable to drive. (Hesseldenz Aff. at ¶ 6.) Flowers was paid from Seaths' personal funds rather than from the service of process fees collected by the Court.[2]

On Saturday, July 10, 1993, Defendant Mark Anthony Duncan ("Duncan") was elected Constable in a caucus election to fill the vacancy left by Seaths' resignation. Tuttle ran against Duncan, and Domi and Flowers supported Tuttle in the election. Duncan officially took office on Monday, July 12, 1993. With Duncan's election, Flowers', Tuttle's and Domi's employment as Center Township Deputy Constables came to an end. The circumstances surrounding the end of their employment are the focus of this dispute.

The essence of plaintiffs' claim is that Center Township Trustee Julia Carson ("Carson") and Duncan collaborated to terminate plaintiffs' employment based upon their political activities and associations. Specifically Tuttle contends that in April 1993, Carson pressured him to drop out of the race and told him that he would be dismissed if he did not withdraw and Duncan won. He claims that several people, including Flowers, told him that they had heard Carson and Duncan talk about "getting rid" of him and Domi. Both Tuttle and Domi claim that they were available and willing to work and that they were in constant contact with the Court staff immediately after the election. They claim that Court staff members informed them that their names had been removed from the computer the morning that Duncan was sworn in, thus denying them access to the computer and making it impossible for them to perform the duties of Deputy Constable. Domi further asserts that Judge Hesseldenz

told him on July 12 "not to come back". (Domi's testimony at Tuttle's Unemployment Compensation Proceedings, Record at 69, 11. 13–19).[3]

Duncan denies these allegations and claims instead that he expected Tuttle and Domi to report for work after his swearing-in. He claims that both he and Carl Drummer[4] attempted to telephone Tuttle on July 12 to ask him to report for work and that Tuttle did not respond to their messages. He claims that neither Tuttle nor Domi reported for work or contacted him regarding their employment and that after three days he believed that they had terminated their employment.

Flowers claims, and Duncan does not dispute, that Flowers reported for work on Monday, July 12, 1993. Duncan asked him to assist in a "move-out", at which point Flowers requested a new identification badge, believing that he needed an I.D. in order to lawfully perform this function. Flowers claims that "they refused to give me one and then told me that I was on Paul Tuttle's side at the election and that my services weren't needed". (Record, p. 42, 11. 8–10.) Duncan, on the other hand, claims that he himself did not have an identification badge, that he did not know how or where to get them, and that he therefore could not provide Flowers with a new badge. Duncan argues that Flowers' refusal to work without a new badge amounted to insubordination and was the reason for his dismissal.

After his employment as Deputy Constable ended, Tuttle filed an Unemployment Compensation Claim against Duncan with the Indiana Department of Employment and Training Services ("Department").[5] A hear-

---

2. Judge Hesseldenz, who presides over the Center Township Small Claims Court, states in his affidavit that during his tenure on the Court, there has never been a check issued to Flowers from Court funds. (Hesseldenz Aff. at ¶ 13.)

3. All evidence drawn from the record of Tuttle's Unemployment Compensation Proceedings will hereinafter be cited as "Record".

4. Drummer, who had previously served process for Seaths, came to the Court with Duncan to voluntarily assist him in carrying out his Constable duties. (Duncan Aff. ¶ 18.) Duncan states

that at the end of his first week in office, he appointed Drummer to the position of Chief Deputy Constable. (Defendant's Statement of Facts at ¶ 52.) Flowers claims that he was told on July 10, 1993 that Drummer would be Duncan's Chief Deputy Constable. (Flowers Aff. at ¶ 6.)

5. Apparently, Domi also filed a claim for unemployment compensation which was granted. (Record at 70, 11. 1–7.) Domi's unemployment compensation award and proceedings have not, however, been put into issue by any of the parties.

ing was held at which Tuttle presented evidence to support his claim that he was fired because of his political opposition to Duncan. The Department initially found that Tuttle "was not discharged for just cause". This holding was reversed on appeal by an Administrative Law Judge ("ALJ") who found that:

> ... the evidence is persuasive that the claimant terminated his employment by job abandonment prior to his replacement
>
> ...
>
> ... Although the claimant had heard rumors to the effect that the new Constable would not keep him because he had refused to drop out of the race against him he made no effort to confirm this with the new Constable himself. Under these circumstances, it is held that the claimant did not act as a reasonably prudent person in maintaining the employment relationship and his leaving of work is held to be for strictly personal reasons, not objectively related to the employment, and without good cause in connection with the work ...

(Record, at 124, 11. 41–53). Tuttle's appeal of the ALJ's decision was dismissed by the Indiana Court of Appeals pursuant to the Court's finding that Tuttle had failed to file an Assignment of Errors.

### B. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.Pro.* 56(c). A genuine issue of material fact exists if there is sufficient evidence for a jury to return a verdict in favor of the non-moving party on the particular issue. *Methodist Medical Center v. American Medical Sec., Inc.*, 38 F.3d 316, 319 (7th Cir.1994). In considering a summary judgment motion, a court must draw all justifiable inferences in the light most favorable to the opposing party, and must resolve any doubt against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Bank Leumi Le–Israel,*

*B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991); *Becker v. Tenenbaum–Hill Associates, Inc.*, 914 F.2d 107, 110 (7th Cir.1990). While the burden rests squarely on the party moving for summary judgment to show "that there is an absence of evidence to support the nonmoving party's case", *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986), the nonmoving party may not simply rest on the pleadings, but must affirmatively demonstrate by specific factual allegations that a genuine issue of material fact exists for trial. *Billups v. Methodist Hosp. of Chicago*, 922 F.2d 1300, 1302 (7th Cir.1991). Conclusory allegations by a party opposing a motion for summary judgment cannot defeat the motion. *Smith v. Shawnee Library System*, 60 F.3d 317, 320 (7th Cir.1995). "The moving party is 'entitled to a judgment as a matter of law' [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552. If doubts remain, however, as to the existence of a material fact, then those doubts should be resolved in favor of the nonmoving party and summary judgment denied. *See, Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir.1989).

## II. ANALYSIS

Tuttle, Flowers and Domi have filed this § 1983 suit claiming that Defendants violated their First Amendment rights by firing them, or not rehiring them, because of their political activities and affiliation. Defendants move for summary judgment on six separate grounds, arguing that they are entitled to judgment as a matter of law because:

1. No Constitutional violation occurred as to Tuttle and Domi because their employment ended by operation of law with Seaths' resignation, or in the alternative, they failed to report to work and were therefore discharged for good cause;

2. Flowers was not officially an employee of the Township or the Constable, or in the alternative, he was discharged for refusing to work and insubordination;

3. Tuttle is collaterally estopped from relitigating issues decided in prior unemployment compensation proceedings;

4. The individual defendants are entitled to qualified immunity, and political considerations are appropriate for the Deputy Constable position;

5. Defendants have made all withholding and benefit payments to which plaintiffs are entitled;[6] and

6. There was no conspiracy between Carson and Duncan.

### A. Existence of Constitutional Violation

The First Amendment prohibits promotion, transfer, discharge, recall and hiring decisions concerning public employees based on political affiliation, unless party affiliation is an appropriate requirement for the position involved. *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 64, 110 S.Ct. 2729, 2732, 111 L.Ed.2d 52 (1990); *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). Of course, for the right to be free of political patronage discharge (the "Elrod–Branti right") to attach, plaintiffs' must be public employees. Employees in the private sector do not enjoy this protection; and it goes without saying that a person cannot be fired from a job he does not hold. Defendants argue that there was no Constitutional violation in this case because no plaintiff was a public employee at the time Duncan assumed office.

Defendants argue that Tuttle and Domi were not employees at the time Duncan assumed office because their employment terminated as a matter of law when Seaths resigned. The cases cited by defendants in support of this argument establish only that a deputy's appointment terminates with the *expiration of the term* of his or her superior. *See, Hord v. State*, 167 Ind. 622, 79 N.E. 916 (Ind.1907); *Indiana State Toll–Bridge Commission v. Minor*, 132 N.E.2d 282 (Ind.App. 1956). The *Minor* court held that the validity of a contract of employment which required approval of the Attorney General was unaffected by the "mere separation of an Attorney General from his office" mid-term, and would continue through the *term of office* of the Attorney General. 132 N.E.2d at 287. While the *Minor* case deals with an entirely different factual situation from the instant case,[7] and it pre-dates the establishment of the "Elrod–Branti right", we think that it lends support to plaintiffs' position that their employment did not end as a matter of law due to the separation of the Constable from his office mid-term. In addition, the facts of this case also seem to indicate that, historically, Center Township Deputy Constables retained their employment even when the appointing Constable's term of office expired and a new Constable took office. Therefore, because both the facts and the law could support a reasonable jury determination that plaintiffs' employment as deputy constables did not terminate by operation of law when Seaths resigned, we cannot grant defendants' motion for summary judgment on this basis.

Defendants also move for summary judgment with regard to Flowers' claim, arguing that neither Duncan nor the Township should be liable for "back pay" for Flowers when he was not an employee of the Township or, officially, of the Constable. If, as defendants contend, Flowers was never an official employee of the Township or the Constable, then the protections afforded in the Elrod–Branti line of cases do not apply to him. The facts with regard to Flowers' employment are undisputed. He was sworn in as a Deputy Constable, issued an identification badge and equipment, and did perform official duties of the position. On the other hand, he also served as Seaths' personal driver and was paid from Seaths' personal funds rather than, as required by law, from service

---

6. Plaintiffs charge that Defendants failed to make payments for withholding taxes, FICA taxes and other taxes or contributions required by plaintiffs' employment as Deputy Constables (Amended Complaint, ¶ 20).

7. *Minor* addressed the question of the validity of attorneys' employment contracts which had to be approved by the Attorney General, when the Attorney General who had originally approved these contracts died mid-term.

of process fees collected by the court.[8] Defendants admit that they "have found no case law to enlighten them as to Flowers' status." *Defendants' Brief* at 18.

Despite the dearth of case law on this specific question, we believe common sense compels a conclusion that a person who, despite his performance of the functions of a public employee, is paid from personal funds rather than through officially sanctioned channels, is a personal employee and not a "public employee". Imagine, for instance, a situation in which a judge needs some extra help and asks her best friend or neighbor to act as an extra law clerk or secretary. This friend or neighbor performs the functions of the job, but is paid from the judge's personal bank account and not by the government. We cannot imagine that, if the judge were to leave the bench for some reason, her successor would inherit the outgoing judge's friend as a court employee. In other words, we consider Flowers, like the hypothetical judge's friend, to be a personal employee of Constable Seaths, not a public employee of the Township. Consequently, Elrod–Branti protections do not apply to Flowers.[9] Even if he were "fired" because of his political affiliations, there was no Constitutional violation. Accordingly, we **GRANT** defendants' motion for summary judgement as to Flowers' claim.[10]

■ Defendants also argue that they are entitled to summary judgment because Duncan had good cause to fire Tuttle and Domi, or, in the alternative, because Tuttle and Domi failed to ask to be rehired. Both parties have presented facts which would support their versions of the events. Resolution of these issues would require the court to weigh the conflicting evidence and to make a determination as to Duncan's motive or intent, which is a "quintessential question of fact". *Kelly v. Municipal Court of Marion County*, 852 F.Supp. 724, 729 (S.D.Ind.1994). These are functions to be reserved for the fact-finder, not the court at this stage.

Although we cannot now resolve the fundamental questions regarding the events and motivations leading up to the end of plaintiffs' employment as deputy constables, defendants also move for summary judgment on several other grounds which we address below.

## B. Collateral Estoppel against Tuttle

In *University of Tennessee v. Elliott*, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986), the U.S. Supreme Court held that "when a state agency 'acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." 478 U.S. at 799, 106 S.Ct. at 3226, *quoting, U.S. v. Utah Construction & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966). Thus, we apply Indiana law to determine whether Tuttle is collaterally estopped from relitigating any fact issues decided in his unemployment compensation proceedings.

In *McClanahan v. Remington Freight Lines*, 517 N.E.2d 390 (Ind.1988), the Indiana Supreme Court set out standards for determining when Indiana administrative decisions are to have preclusive effect:

**8.** Indiana Code 33–11.6–8–4(d) provides that "[t]he compensation of the constable and deputy constables shall be paid solely from the service of process fees collected under IC 33–11.6–4–15."

**9.** An analogy to the treatment of independent contractors in this context further supports our conclusion. The Seventh Circuit has consistently held that independent contractors have no constitutional protection against political patronage firing. *See, Downtown Auto Parks, Inc. v. City of Milwaukee*, 938 F.2d 705, 710 (7th Cir.1991), *cert. denied*, 502 U.S. 1005, 112 S.Ct. 640, 116 L.Ed.2d 657 (1991) (noting that all circuits considering the question have held that Elrod–Branti protections do not apply to independent contractors); *Triad Associates, Inc. v. Chicago Housing Authority*, 892 F.2d 583, 587 (7th Cir.1989), *cert. denied*, 498 U.S. 845, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990) (recognizing "a cognizable distinction" between the First Amendment interests of independent contractors and public employees in this context.), *citing, LaFalce v. Houston*, 712 F.2d 292, 293–94 (7th Cir.1983), *cert. denied*, 464 U.S. 1044, 104 S.Ct. 712, 79 L.Ed.2d 175 (1984).

**10.** Because we find that Flowers was not an employee of the Township or, officially, of the Constable, we need not reach the question of whether he was "fired" for good cause.

1) whether the issues sought to be estopped were within the statutory jurisdiction of the agency;

2) whether the agency was acting in a judicial capacity;

3) whether both parties had a fair opportunity to litigate the issues;

4) whether the decision of the administrative tribunal could be appealed to a judicial tribunal.

*McClanahan*, 517 N.E.2d at 394.[11]

In addition to the four-prong *McClanahan* test, there are two "implicit requirements" for the operation of collateral estoppel: the parties must be the same in the administrative proceedings and the subsequent suit, and the issue(s) determined at the administrative level must be identical to issue(s) raised in the subsequent suit. *See, Kelly*, 852 F.Supp. at 739; *Spearman v. Delco Remy Div. of GMC*, 717 F.Supp. 1351, 1357 (S.D.Ind.1989).

■ The parties agree that the first, second and fourth prongs of the *McClanahan* test and the requirement that the parties be the same are satisfied here. Plaintiffs contend that defendants have failed to establish the existence of identical issues or a full and fair opportunity to litigate those issues in the administrative proceedings. Specifically, plaintiffs contend that because the agency did not and could not have decided the constitutional "issue" presented in this case, the issues decided by the ALJ and those presented in this suit are not identical. In addition they argue that there is a material issue of fact as to whether Tuttle had a fair and adequate opportunity to litigation the issue of voluntary resignation at the administrative level.

■ Initially we note that plaintiffs have apparently confused the doctrines of res judicata (claim preclusion) and collateral estoppel (issue preclusion). Res judicata applies to preclude the re-litigation of a *claim* which has already been litigated in a prior proceeding. "Collateral estoppel is a 'narrower application' of preclusion and applies 'where a *particular issue* is adjudicated in a prior action and is put in issue in a subsequent suit on a different cause of action ...'" *Studio Art Theatre of Evansville, Inc., and William Montrose v. City of Evansville, Gann and Levco*, 76 F.3d 128, 131 (7th Cir.1996), *quoting, Gorski v. Deering*, 465 N.E.2d. 759, 762 (Ind.Ct.App.1984); *see also, Spearman*, 717 F.Supp. at 1357 ("while res judicata precludes relitigation of entire legal claims, the doctrine of collateral estoppel operates to bar the relitigation of a factual issue that has been determined in a prior proceeding"). Thus, when discussing collateral estoppel, the fact that the administrative law judge did not and could not have addressed the Constitutional *claim* presented in this case is irrelevant. The question is rather whether the ALJ decided particular issues which are also presented in the present suit.

In this case, it is clear that the ALJ addressed and decided more than simply whether Tuttle was discharged for "just cause", as plaintiffs contend. Tuttle relies on *Kelly* to support its argument that the "just cause" issue decided at his unemployment compensation hearing is not identical to the issues presented in his § 1983 claim. *Kelly* can be easily distinguished from the present case in several important ways. This court dismissed the collateral estoppel argument raised in *Kelly* in part because the defendant in that case was not a party to the prior administrative proceeding. Furthermore, there is no indication that the administrative proceedings at issue in *Kelly* addressed anything other than the issue of discharge for just cause. In contrast, Tuttle's administrative proceedings addressed and determined not only the just cause issue, but also the "voluntary quit" and political patronage issues which Tuttle now seeks to relitigate.[12]

---

11. The *McClanahan* court did not apply collateral estoppel to preclude relitigation of issues determined in prior administrative proceedings because of the informal nature of the administrative proceedings and the presence of a conflict of interest. 517 N.E.2d at 394–95.

12. Similarly, the other cases cited by Tuttle provide no support for his attempt to avoid collateral estoppel because the administrative proceedings in those cases neither addressed nor determined the specific fact issues raised in the subsequent § 1983 claims. *See, Lupo v. Voinovich*, 858 F.Supp. 699 (S.D.Ohio 1994) (administrative determination that job action was not

Tuttle presented evidence to the ALJ (indeed substantially all of the same evidence he has presented in support of his § 1983 claim) to support his claim that he was fired (and thus did not "quit") because of his political activities. The ALJ specifically referred to this evidence in his decision, finding that although Tuttle had heard rumors that he would be or had been fired because of his political activities, he acted unreasonably in relying upon these rumors and therefore his "leaving of work is held to be for strictly personal reasons, not objectively related to the employment, and without good cause in connection with the work ...". Plaintiff's argument that despite any administrative ruling on "just cause", "a First Amendment violation could be established if Tuttle can show that he failed to report for work because he was reliably informed that he would not be re-employed in his chief deputy position as a result of his political activity ..." (Plaintiffs' Memorandum at 22) misses the point. Tuttle has already had an opportunity to make this showing and failed. The doctrine of collateral estoppel prevents him from getting a second bite at the apple. Tuttle's contention that he did not have a full and fair opportunity to litigate the issue of possible political motivation behind his discharge, and whether or not he voluntarily quit, also rings hollow in light of the undeniable fact that he presented evidence on these issues, upon which the ALJ relied in making his determination.[13]

We find that Tuttle had a full and fair opportunity to litigate the issue of the reasons for the termination of his employment as Deputy Constable, i.e. allegations of political patronage and the "voluntary quit" issue. These issues, which are identical to the fundamental issues underlying his § 1983 claim, were decided against Tuttle in his unemployment compensation proceedings and cannot now be re-litigated. Accordingly, defendants' Motion for Summary Judgment is GRANTED with regard to Tuttle's claim.

## C. Qualified Immunity

■ Qualified immunity shields government officials from liability for civil damages where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known at the time the conduct occurred. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Assuming *arguendo* that defendants did fire or fail to rehire Domi[14] because of his political affiliation and activities, we must determine whether political compatibility is an appropriate requirement for the position of Deputy Constable, and if not, whether that was clearly established at the time the adverse employment decision was made.

■ Defendants argue that this is a case of first impression because there have been no political patronage cases involving the "unique" position of Deputy Constable. To hold that plaintiffs had no clearly established right in 1993 to be free of politically motivated dismissal simply because there had been no case dealing specifically with the position of Deputy Constables in the state of Indiana would be an absurd elevation of form over substance. It is not merely the official title, but rather "the powers inherent in a given office", that determine whether political compatibility is an appropriate requirement. *Americanos v. Carter,* 74 F.3d 138 (7th Cir.1996). The relevant inquiry is "whether the position authorizes, either directly or indirectly, meaningful input into governmental decision-making on issues where there is room for principled disagreement on goals or their implementation." *Id.,* at 141, *quoting, Heideman v. Wirsing,* 7 F.3d 659, 663 (7th Cir.1993); *see also, Lohorn v.*

taken in bad faith did not actually and necessarily determine that political affiliation played no role; no argument or evidence was presented at administrative proceedings regarding political patronage); *Davenport v. N.C. Dept. of Transp.,* 3 F.3d 89 (4th Cir.1993) (no allegations regarding political motivation for firing were made at administrative proceedings).

**13.** The fact that Tuttle's appeal to the Indiana Court of Appeals was denied because of his failure to file an Assignment of Errors *does not* defeat the preclusive effect of the administrative determination. *See, Yellow Cab Co. v. Williams,* 583 N.E.2d 774, 779 (Ind.App.1991).

**14.** Having granted summary judgment with regard to Tuttle's and Flowers' claims, Domi is the sole remaining plaintiff.

*Michal,* 913 F.2d 327, 334 (7th Cir.1990) (regardless of whether an employee's position is considered to be a "policymaking" position, he is protected from politically motivated dismissal unless the position authorizes meaningful input into government decision making).

The duties of deputy constables are statutorily limited to "serving process, attending court as bailiff and carrying out the orders of the court." IC 33–11.6–8–4(a). This court has previously held that political affiliation is not an appropriate requirement for a bailiff, for purposes of a § 1983 freedom of political association claim. *Kelly,* 852 F.Supp. at 735–36. In making that determination, we relied upon the Supreme Court's seminal political patronage opinion, *Elrod v. Burns,* in which the Court held that employees of the Cook County Sheriff, among them a bailiff and process server, had a Constitutional right to be free of political patronage dismissal. 427 U.S. at 373, 96 S.Ct. at 2689–90. Thus it was clearly established as early as 1976 that political patronage dismissals of employees serving in the same positions and performing the same duties as plaintiffs, albeit with different titles, are unconstitutional.

We therefore find that political affiliation is not an appropriate requirement for the position of Deputy Constable, and that because this was clearly established in 1993, defendants are not entitled to qualified immunity. Accordingly, defendants motion for summary judgment as to the remaining claim of plaintiff Domi must be **DENIED.**

### D. Tax Witholding—Damages

■ Defendants also move for summary judgment with regard to paragraph 20 of the amended complaint, in which plaintiffs allege that defendants failed to make payments for withholding taxes, FICA taxes, and other taxes or contributions required by plaintiffs' employment. Any question of whether defendant made tax payments and contributions as required by plaintiffs' employment is not properly within this Court's jurisdiction, and we will therefore not address the merits of this issue. We construe defendants' motion for summary judgment on this issue as a Rule 12(b)(1) motion to dismiss for lack of

subject matter jurisdiction, and grant such motion. *See, Barnhart v. U.S.,* 884 F.2d 295, 296 (7th Cir.1989); *Crawford v. U.S.,* 796 F.2d 924, 928–30 (7th Cir.1986) (preliminary jurisdictional matters are appropriately dealt with as motions to dismiss).

### E. Conspiracy between Carson and Duncan

■ Defendants motion for summary judgment with regard to the issue of a conspiracy between Carson and Duncan rests solely on their contention that Carson had no legal authority to hire or fire Deputy Constables and that Carson never, as plaintiffs allege, told or attempted to persuade Duncan that he should terminate Domi. As to the first contention, Carson's legal authority or lack thereof to hire or fire Domi is irrelevant. As defendants point out, Carson can be liable under § 1983 as a private person acting jointly with Duncan. *Adickes v. S.H. Kress and Company,* 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970); *Greco v. Guss,* 775 F.2d 161, 167 (7th Cir.1985) (joint actions of private persons and public officers in denying civil rights are cognizable under § 1983). The issue of whether Carson had any part in the termination of Domi is a material issue of fact which is disputed by the parties, and cannot therefore be determined by the court at the summary judgment stage. Accordingly, defendants' motion for summary judgment with regard to the allegation of a conspiracy between Carson and Duncan (and therefore with regard to Carson's liability), must be **DENIED.**

### III. CONCLUSION

For the reasons stated above, Defendants' Alternative Motions for Summary Judgement are resolved as follows:

1) **DENIED** with regard to the question of the existence of a Constitutional violation. In this respect the court finds as a matter of law that Tuttle's and Domi's employment did not terminate by operation of law with Seaths' resignation. The evidence is in conflict regarding the events leading to plaintiffs' termination of employment.

**624**

2) **GRANTED** with regard to Flowers' claim. The court finds as a matter of law that Flowers was not a public employee and therefore not protected from political patronage dismissal.

3) **GRANTED** with regard to Tuttle's claim. The court finds that Tuttle is collaterally estopped from relitigating the issue of whether he voluntarily quit or was dismissed because of his political activities.

4) **DENIED** insofar as defendants' claim they are shielded from liability by the doctrine of qualified immunity.

5) **DENIED** with regard to the question of the existence of a conspiracy between defendants Carson and Duncan.

Tuttle's and Flowers' claims are hereby dismissed in their entirety, and Domi is the sole remaining plaintiff. This ruling does not resolve all claims against all parties, and thus no partial judgment shall issue pursuant to Federal Rule of Civil Procedure 54(d). Should any party desire partial judgment to be entered, it may file a motion for partial judgment under Fed.Rule Civ.Proc. 54(d) within 20 days from the date of this ruling. The opposing party shall then have 20 days to respond to any motion so filed.

It is so ORDERED.