In the

# United States Court of Appeals

## For the Seventh Circuit

No. 06-2866

ROBERT POWERS,

*Plaintiff-Appellant*,

*v.*

GEORGE E. RICHARDS, ET AL.,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Central District of Illinois.
No. 04-C-3024—**Jeanne E. Scott**, *Judge*.

ARGUED JANUARY 23, 2008—DECIDED DECEMBER 2, 2008

Before MANION, ROVNER, and EVANS, *Circuit Judges*.

ROVNER, *Circuit Judge*. Robert Powers, a former State of Illinois employee and a member of the Republican Party, brought this civil-rights suit under 42 U.S.C. § 1983 claiming that the governor of Illinois and his staff violated his right to freedom of association when they fired him because of his party affiliation. He also asserted that the members of the Illinois Civil Service Commission denied him procedural due process when they fired him without an adequate pre-deprivation hearing. The district

court granted summary judgment in favor of all defendants. Because Powers cannot show that his constitutional rights were violated, we affirm.

From August through September 2002 Powers was a Deputy Director of the Illinois Department of Central Management Services (CMS), the "central procurement and administrative services agency" for the state. *See* http://www.cms.illinois.gov/cms/about_cms/quickfacts.htm (last visited Oct. 2, 2008). He was assigned to work as a liaison to the governor's office. According to the defendants, during the waning months of Governor George Ryan's administration, Powers was part of a political scheme to ensure that certain state employees retained their jobs after Governor Ryan, a Republican, left office. These employees had been appointed to four-year terms, during which they could not be fired except for poor performance. Once these terms ended, they could be fired for any reason. *See* 20 ILCS 415/8b.18, 8b.19. Their terms were set to expire shortly after Governor Ryan, who had decided not to seek reelection, left office. Concerned that the new governor would not reappoint them, in September 2002, they attempted to find a way to secure their jobs. First, they resigned their positions, ostensibly to take different, non-appointed jobs in the state government. A few days later, they returned to their former positions with new four-year terms. Voila! Their jobs were secure until 2006, long into the new governor's term. Powers's role in the scheme was vital, but quite simple: he signed some of the personnel forms required to effectuate the transfers from one job to another. The problem was that he did not have the authority to permit these

transfers or to sign the forms. Only CMS's Director—and not a deputy—may approve transfers of employees, and the Director refused to sign the forms. Powers knew that the Director would not sign the authorizations, and so Richards signed his name in boxes reserved for the Director's signature.

Shortly thereafter, in October 2002, Powers took a job as the Executive Secretary of the Illinois Civil Service Commission. The Commission is composed of five Commissioners, and no more than three may be members of the same political party. The Commission, among other duties, hears appeals of state employees regarding discharges, suspensions, transfers, allocations, layoffs and demotions; modifies the Personnel Rules when necessary; and investigates possible violations of the Personnel Code. According to the official position description, the Executive Secretary is the chief administrative officer of the Commission and, in that capacity, among other duties, drafts "major rules and regulations" and presents them to the Commission; makes recommendations to the Commissioners about how disputes presented at hearings should be resolved; enforces the Commission's decisions; develops the budget and approves expenditures; coordinates with other agencies on matters relating to the Personnel Code and Rules; recommends amendments to the Personnel Code; interprets the Personnel Code and Rules for state officials, employees, and members of the public; and investigates alleged violations of the Personnel Code and Rules.

In January 2003, Rod Blagojevich, a Democrat, acceded to the governor's office. His administration began an

investigation into the state employees' scheme to subvert the appointment system. In April 2003, Governor Blagojevich's counsel sent a letter to the Commission detailing the findings of the investigation and concluding that Powers and two others who had been working in Governor Ryan's office "appear to have played key roles in concocting and implementing this scheme." Two days later, Powers received a copy of this letter, and the Commission met to consider the allegations against him. At the meeting, the Commission decided to place him on administrative leave with pay. In May 2003, the General Counsel for CMS gave the Commission an investigative report that further described the scheme. The next day, the Commission decided to suspend Powers with pay. The Commissioners voted unanimously to authorize then-Chairman George Richards to hold a hearing with Powers. The Commissioners further granted Richards the authority to fire Powers if Powers did not come forward with exculpatory evidence.

On May 21, 2003, Richards sent Powers written notification that the Commission was considering firing him because he fraudulently signed personnel forms. The letter listed the names of potential witnesses, informed Powers of the hearing date, and told him that he had the right to respond. Richards enclosed documents supporting the accusations, including copies of the personnel forms Powers signed purportedly as the Director of CMS.

On May 29, 2003, Richards met with Powers, reiterated the accusations against him, showed him the evidence, and invited Powers to respond. Powers admitted that he

signed his name in the spot reserved for the signature of the Director of CMS but went on to explain his version of the events. According to Powers, the Director approved the transfers but did not want to sign the forms, and so requested that someone in the Governor's office sign them. Powers insisted that prior administrations also had followed this "process." Powers, however, did not dispute that he signed his name as the Director CMS without official authorization. Thus, Richards recommended that CMS fire him, which it did. Powers then received a post-deprivation hearing before an Administrative Law Judge (ALJ) where he was represented by counsel and had the opportunity to conduct discovery, present evidence, and cross-examine witnesses against him. In November 2003, the ALJ issued his findings and concluded that the Commission was warranted in firing Powers.

In granting summary judgment for the defendants, the district court determined first that Powers lawfully could be fired for his political affiliation because party loyalty is relevant to the job of Executive Secretary of the Commission, and second that Powers received all of the process he was due at his pre-termination hearing. We review this decision *de novo*, *see Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008), and agree with the district court that Powers cannot succeed on either of his claims.

Powers first argues that he submitted sufficient evidence demonstrating that Governor Blagojevich and his staff violated Powers's right to freedom of association

under the First Amendment when they urged the Commission to fire him for his affiliation with the Republican Party. Although there is virtually no evidence supporting a claim that Powers was fired because of his political affiliation, there is ample evidence in the record that he was fired because he tried to help other employees retain their jobs by falsely signing personnel forms as the Director of CMS. Curiously, however, the defendants have not pressed this point and instead have conceded, for the purposes of the summary judgment motion, that they wanted to get rid of Powers because he is a Republican. But even so, we agree with the district court that political affiliation is an appropriate requirement for the position of Executive Secretary and thus Powers could lawfully be fired solely for partisan reasons.

Like a perpetual ping-pong match, control over governments changes hands from one political party to another and back again. Generally, a change in administration, with its corresponding shift in policy goals and priorities, does not affect government employees. The political affiliation of most employees does not affect their ability to do their jobs, and a new administration might violate the First Amendment if it fired these employees merely because they support a different political party (or if it refused to hire applicants who were not loyalists of the governing party). *See Branti v. Finkel*, 455 U.S. 507, 513, 515-16 (1980); *Elrod v. Burns*, 427 U.S. 347, 372-73 (1976). Some jobs, however, can be performed satisfactorily only when the employee supports the administration's ideas about policy and governing. If these jobs are filled with employees who take a view different

from the administration, then these employees could thwart the government's ability to enact the policies it had been elected to advance. Thus, where party loyalty is necessary to effectively perform a job, the First Amendment does not prohibit the administration from firing an employee based on party affiliation. *See Branti*, 455 U.S. at 518; *Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d 750, 755-56 (7th Cir. 2002).

In assessing whether political loyalty may play a role in an employment decision, we consider whether the position requires the employee to exercise political judgment by crafting policy, *see Moss v. Martin*, 473 F.3d 694, 699 (7th Cir. 2007), that is, whether the position "authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation," *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir. 1981); *see also Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 355 (7th Cir. 2005). We further ask whether the position entails the exercise of a substantial amount of *political* (as distinct from professional) discretion. *See Allen v. Martin*, 460 F.3d 939, 944 (7th Cir. 2006); *Riley v. Blagojevich*, 425 F.3d 357, 360 (7th Cir. 2005).

Elected officials must rely on official descriptions of individual positions when deciding which employees they may and may not replace with like-minded partisans. Thus, as long as an official description is reliable, we focus on the inherent duties of the position as listed in the description. *See Riley*, 425 F.3d at 361. Powers does not dispute that the official job description accurately

explains the responsibilities of the Executive Secretary, and so our analysis of his job duties begins and ends there. *See Allen*, 460 F.3d at 944.

Powers concedes that the Executive Secretary is responsible for policymaking, but he contends that political loyalty is not a necessary qualification for all policymakers. Although he is correct that the label of "policymaker" is not a talisman for a job that requires political loyalty, a reading of the position description reveals that, for the Executive Secretary, the description "policymaker" is more than a generic label. Rather, the Executive Secretary must use political discretion and has the ability to influence important government decisions about personnel matters. The Executive Secretary is responsible for drafting and proposing rules changes and modifications to the Personnel Code, which affects all state employees, and is charged with advising the Commission about how it should resolve personnel disputes. These responsibilities give the Executive Secretary a hand in making decisions on a wide range of personnel issues. The Executive Secretary also has broad discretion over personnel matters, including the authority to decide which complaints to prioritize for investigation, how to enforce the Commission's decisions, and how to interpret the Personnel Code. In all of these decisionmaking and discretionary functions, there is room for the administration to legitimately disagree with the Executive Secretary's positions or exercise of authority, thus making political loyalty an appropriate job qualification. *See Allen*, 460 F.3d at 945; *Americanos v. Carter*, 74 F.3d 138, 142 (7th Cir. 1996); *Selch v. Letts*, 5 F.3d

1040, 1047 (7th Cir. 1993); *Tomczak v. City of Chicago*, 765 F.2d 633, 642 (7th Cir. 1985). Moreover, the Executive Secretary represents the Commission at meetings with state officials and with other organizations outside of state government to resolve questions on personnel matters and to interpret the Personnel Code. Communicating the positions of the Commission and interpreting state law to those inside and outside of the government require political sensitivity, and the administration would want a loyal partisan, who would accurately reflect its position, in this role. *See Allen*, 460 F.3d at 945.

We conclude that the Executive Secretary has broad discretion to make policy, set priorities, interpret the law, and speak on behalf of the Commission, and that if the Executive Secretary is a political enemy of the sitting governor, the Executive Secretary could hamper the implementation of the governor's legitimate policies. Therefore, the administration may require the person who fills the position to perform those responsibilities consistently with the administration's positions and priorities, and it is entitled to fill the position with an employee who is a member of the same political party and who will be loyal to the governor and advance his or her policies.

According to Powers, the role of the Commission is to ensure that personnel decisions are based on merit and are unaffected by political considerations. Powers also points out that the Commission is independent of the governor, that the Commission must be composed of no more than three members of the same political party, and

that the Executive Secretary's allegiance lies with the Commission, not the governor. Thus, he concludes that the Executive Secretary position is politically "neutral" and that affiliation with a particular party is not a valid requirement for the position. But this argument misses the point. Just because the law that the bi-partisan Commission and the Executive Secretary are charged with implementing aims to ensure that the most qualified people receive jobs without undue political meddling does not mean there must be universal agreement on how to administer it, interpret its provisions, or set priorities for amendments or investigation into wrongdoing. Although the administration and Powers might share the ultimate goal of ensuring fair, merit-based government employment, their means to achieve this goal might differ, making political loyalty an appropriate requirement for the position of Executive Secretary. *See Americanos*, 74 F.3d at 641; *Selch*, 5 F.3d at 1045; *Tomczak*, 765 F.2d at 142.

Powers also argues that party affiliation is not an appropriate qualification for his former job because he was hired through a merit-based procedure and, under state law, can be fired only for cause. But we rejected that very argument in *Flenner v. Sheahan*, 107 F.3d 459, 464 (7th Cir. 1997), finding that the Illinois legislature's judgment that a superior must have a good reason for firing an employee is irrelevant to whether removing the employee for political reasons violates the First Amendment. *Flenner*, 107 F.3d at 464. Powers might have a remedy under Illinois law if he can show that the administration or the Commissioners infringed his rights under the

Personnel Code, but his constitutional rights have not been violated; so he cannot succeed on his federal civil-rights claim. *See Riley*, 425 F.3d at 365.

Powers next argues that he presented sufficient evidence that the hearing he received before he was fired was constitutionally deficient. Illinois law provides that the Executive Secretary can be fired only "for cause," so Powers had a property interest in retaining his job and was entitled to due-process before the state could deprive him of it. *See Ryan v. Ill. Dep't of Children & Family Servs.*, 185 F.3d 751, 761 (7th Cir. 1999); *see also Argyropoulos*, 539 F.3d at 741 (noting that tenured public employees enjoy a "near-categorical guarantee" of process before they are removed from their positions). Where, as here, an employee is entitled to a full hearing after he has been fired, a pre-deprivation hearing satisfies due process if the employee receives notice of the allegations, an explanation of the evidence against him, and a chance to tell his version of the story. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985); *Michalowicz v. Vill. of Bedford Park*, 528 F.3d 530, 536-37 (7th Cir. 2008).

Powers does not dispute that he received notice that he had been accused of improperly signing his name as the Director of CMS, that the Commission explained the evidence against him, and that he was given the opportunity to explain his version of events. He argues, however, that, before the hearing, the Commissioners had already agreed to fire him and thus his hearing before Commissioner Richards was essentially a sham. A hearing where the decisionmaker has prejudged the outcome does not

comport with due process because it effectively denies the employee the opportunity to respond to the accusations against him. *See Ryan*, 185 F.3d at 762.

But Powers has put forward nothing except for his own speculation to support his contention that the Commission decided to fire him before the hearing. Rather, the undisputed evidence shows that the Commissioners authorized Commissioner Richards to hold the hearing with Powers, and, if Powers failed to provide new and exculpatory evidence, to remove him from his position. Furthermore, there is no evidence that Richards had made up his mind to fire Powers before the hearing. Instead, the record shows that Richards listened to Powers's explanation that he believed the personnel transfers were valid and that the Director of CMS had approved them. But because Powers conceded that he signed forms to authorize personnel transfers as the Director of CMS knowing that the Director had refused to sign them, Richards concluded that Powers had not presented evidence of his innocence. Thus Richards exercised his authority and fired Powers. Even if prior to the hearing Richards was inclined to believe Powers should be fired, there would be no due-process violation as long as he kept an open mind, *see Ryan*, 185 F.3d at 762, and Powers has presented no evidence that nothing would have persuaded Richards not to fire him, *see Head v. Chicago Sch. Reform Bd. of Trs.*, 225 F.3d 794, 804 (7th Cir. 2000) (noting that adjudicators are presumed to act in good faith absent evidence of actual prejudgment).

Powers also complains that, because only the Commission had the authority to remove him, he was

entitled to a pre-termination hearing before all of the Commissioners. But Powers *did* receive a hearing before the person with the authority to determine his fate—the Commissioners had delegated that authority to Commissioner Richards. Furthermore, even if the Commission had retained the ultimate authority to fire Powers, the Constitution does not entitle an employee to a pre-termination hearing in front of the ultimate decisionmaker. *See Riccio v. County of Fairfax, Va.*, 907 F.2d 1459, 1465 (4th Cir. 1990); *Los Angeles Police Protective League v. Gates*, 907 F.2d 879, 891 (9th Cir. 1990); *Loudermill v. Cleveland Bd. of Educ.*, 844 F.2d 304, 312 (6th Cir. 1988).

Powers also argues that his post-deprivation hearing was constitutionally deficient and that he therefore should have received more elaborate pre-termination process, but this argument, too, misses the mark. As long as a more-searching post-termination procedure is *available*, the pre-termination proceedings need only establish that there are reasonable grounds to support the removal of the employee. *See Loudermill*, 470 U.S. at 545-46; *Baird v. Bd. of Educ.*, 389 F.3d 685, 690-91 (7th Cir. 2004). Powers cannot dispute that Illinois gave him the right to a full hearing—where he was represented by counsel and allowed to conduct discovery, present evidence, and cross-examine witnesses—and that he took full advantage of it. If his post-termination hearing fell short of due-process requirements, his remedy was to raise a constitutional challenge to those proceedings, not to use the alleged deficiencies as grounds to attack his pre-termination hearing. Indeed, Powers must have understood this because he actually raised constitutional challenges to his

post-termination hearing. The district court, however, dismissed all of the claims relating to the post-termina-tion hearing. Powers does not argue in his briefs on appeal that this decision was incorrect. Thus, he has abandoned any argument that the district court should have considered his claims regarding his post-termination hearing. *See Ruffin-Thompkins v. Experian Info. Solutions, Inc.* 422 F.3d 603, 607 n.1 (7th Cir. 2005); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000).

Therefore, the judgment of the district court is AFFIRMED.